## UNITED STATES DISTRICT COURT
## NORTHEN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**MARQWESHA DAVIS,**
*individually and on behalf of a class of
similarly situated persons,*

     *Plaintiff,*

     v.

**TOMOCREDIT INC. d/b/a TOMO
CARD, COMMUNITY FEDERAL
SAVINGS BANK, EXPERIAN
INFORMATION SOLUTIONS, INC.
*and* TRANS UNION LLC,**

     *Defendants.*

Case No:

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Marqwesha Davis ("Ms. Davis"), on behalf of

herself and all similarly situated individuals, by and through her attorneys, Seraph

Legal, P.A., and complains of the Defendants, Tomocredit Inc. doing business as

Tomo Card ("Tomocredit"), Community Federal Savings Bank ("Community

Federal"), Experian Information Solutions, Inc. ("Experian"), and Trans Union

LLC ("Trans Union"), (collectively, the "Defendants"), stating as follows:

## DESCRIPTION OF THE CASE

1.     This is an action brought by Ms. Davis against the Defendants for violations of the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et seq.* ("**FCRA**"), against Tomocredit and Community Federal only for violations of the ***Florida Consumer Collection Practices Act***, § 559.55, Fla. Stat., *et seq.* ("**FCCPA**"), against Tomocredit only for violations of the ***Florida Telemarketing Act*** ("**FTA**"), Fla. Stat. § 501, et. seq., and the *Electronic Funds Transfer Act*, 15 U.S.C. § 1693, *et seq.* ("**EFTA**").

2.     Until September 2023, Tomocredit issued a Mastercard® credit card called the Tomo Card through Community Federal, who supervised and approved of all policies and procedures concerning the cards issuance and was the lender to consumers who obtained the credit card, and approved all credit applications.

3.     Community Federal failed to notice some red flags, including:

a.     Tomo Card required consumers to consent to electronic payments as a condition of credit granting, despite this requirement expressly violating the EFTA;

b.     Tomo Card required consumers to make weekly payments, even though this violated 15 U.S.C. § 1637 which requires a credit card issuer to provide a statement of account at least **21 days prior** to a payment being due, a clear and obvious impossibility with weekly billing.

4.    Tomocredit's investment pitch was primarily that its credit card did not utilize credit scores, but rather looked at the applicant's income and cash flow. It charged no interest and no annual fee, and claimed it would make a profit from interchange fees alone – the 1.3% to 2.3% merchants pay to the Mastercard payment network, a *portion* of which went to Tomocredit.

5.    Such a business model quickly proved untenable. Traditional credit card issuers get paid the identical interchange fees and even with interest rates typically exceeding 25% annually and annual fees averaging $105 annually[1].

6.    Tomocredit, whose credit card applications did not consider a consumer's credit score and which forswore interest on balances and annual fees, very quickly ran into serious financial trouble as, unsurprisingly, the failure to consider credit scores when issuing credit quickly led to a large percentage of accounts defaulting.

7.    Unpaid bills quickly racked up at Tomocredit; it was even sued by the vendor who produced the physical credit cards, alleging in detail the great obfuscations Tomocredit engaged in to avoid paying a $700,000 bill for card manufacturing, printing and mailing. It settled the lawsuit, agreeing to pay off the balance in $40,000 per month installment payments, and shortly thereafter also defaulted on these payments.

---

[1] https://www.nerdwallet.com/article/credit-cards/credit-card-annual-fee-free

8.      More red flags about Tomocredit quickly started waiving – numerous consumer complaints were filed with advocacy organizations like the Better Business Bureau ("BBB"), a great number of which echoed the same sentiments: Tomocredit had no customer service phone number, and required all communication to be done over e-mail, most of which went unanswered.

9.      Records from the BBB show a staggering 548 complaints filed in the a recent 12 months against Tomocredit. Tomocredit  rating was "F," the lowest possible score. In comparison, Synovus Bank, a much larger issuer of credit cards with $60 Billion in assets, 249 branch locations, and over 500,000 credit cards accounts issued, had only 29 complaints in the same time period.

10.     As Tomocredit's financial problems worsened, it began to take more extreme means to attempt to collect past-due balances. This included:

   a.      Sending out collection e-mails at all hours of the night (often after midnight), despite the laws of many states, including Florida, prohibiting collection communications after 9 p.m.;

   b.      Stating in some collection communications it was "illegal" not to re-pay credit card debt;

   c.      Threatening that failure to pay would cause a consumer's credit score to fall off a cliff (literally showing a cliff and a ball labeled "credit score" falling);

d.      and that non-payment would result in balances being sent to True Accord, a collection agency, even though no contract to collect debt between Tomocredit and True Accord existed, and no accounts were ever referred there.

11.     Tomocredit also leveraged its status as a furnisher of information to at least three credit reporting agencies ("CRAs") in an attempt to wrench payment card holders, reporting inflated balances and paid accounts as unpaid.

12.     Further, Tomocredit reported information about credit card accounts to CRAs, including Trans Union and Experian, with frequent inaccuracies:

a.  reporting the same account twice as two purportedly different accounts but with different balances,

b.  reporting accounts as "past due" despite payments being made on time,

c.  reporting past due amounts which exceeded the total balance reported owed.

13.     When disputed, Tomocredit would simply verify its information as accurate, even though a bare-minimum investigation would have quickly revealed the information reported to the CRAs was flawed.

14.     Around September 2023, Community Federal stopped issuing new Tomo Card Mastercards. Around this time, at least two major nationwide CRAs,

Equifax and Experian, terminated Tomocredit's subscriber agreement also deleted all previously-reported account data from their files.

15.    This is an extraordinary step rarely taken by the CRAs.

16.    Only in instances where the credibility of the data furnisher is severely poor do the CRAs deem it necessary to delete *every* account reported by the data furnisher as a precaution.

17.    Tomocredit then pivoted to selling a product to consumers called TomoBoost, which was a credit-repair scheme consisting of Tomocredit knowingly reporting fake, backdated, non-existent "credit card" accounts to Equifax, Experian and Trans Union.

18.    These fake accounts reported the consumer had a "credit limit" between $10,000 and $30,000 with TomoBoost for the last 24 months. This reporting was intentionally false. As the line of credit could not be used to buy anything.

19.    As of August 29, 2024, the major, three nationwide CRAs appear to have terminated Tomocredit's ability to report.

20.    Undaunted, Tomocredit continues to bill its TomoBoost customers, monthly, for credit repair services relating to its fake-tradeline reporting, even though the tradelines no longer appear on any consumer credit report. Tomocredit is still actively signing up new customers for its service, promising positive

reporting to Equifax, Experian, and Trans Union – a service it cannot possibly provide.

21.    Tomocredit also aggressively began attempting to debit consumer's checking accounts or other payment methods for balances supposedly owed on legacy credit card accounts, even when the consumer did not owe anything to Tomocredit and the consumer had not authorized any such electronic debit.

22.    To market its new fake-tradeline product, Tomocredit bombarded prior Tomo Card customers with dozens (or more) text messages in a short period of time, a substantial portion of which were sent well after 8 p.m. and sometimes as late as 1 a.m., despite Florida law clearly restricting the time-of-day telemarketing solicitations can be made.

23.    From September 2023 onward, when Community Federal stopped allowing new Tomo Credit Mastercard accounts to be opened, Tomocredit began aggressively attempting to collect any and all existing past-due balances, emailing, texting and calling consumers at all hours of the day and night (often after midnight), making all manner of threats, including one in which it asserted, bizarrely, that it was illegal under United States law to fail to repay a credit card debt.

24.    For months, Trans Union was the lone holdout amongst the major CRAs. There were numerous indicators that Tomocredit was not a reliable source of accurate information.

25.    Trans Union was aware Tomocredit was reporting duplicated data as well as data that could not possibly be true (like a past-due balance which exceeds the total balance owed on an account). Trans Union was aware that that Tomocredit's bank sponsor terminated the issuance of new Tomo Credit Mastercard accounts due to its conduct. Trans Union was aware Tomocredit was now brazenly advertising its TomoBoost service which offered to report false information to Trans Union in a bid to puff up a consumer's credit score. Trans Union was aware that the other major CRAs had long since dropped Tomocredit as a furnisher of data.

26.    Despite all of this, Trans Union continued to report data from Tomocredit in reports it sold about consumers until around April 2024.

## JURISDICTION AND VENUE

27.    Subject matter jurisdiction for Plaintiff's FCRA claims arises under 28 U.S.C. § 1331, as the FCRA is a federal statute and the relevant transactions were committed within Leon County, Florida.

28.     This Court has supplemental jurisdiction over Plaintiff's FCCPA and FTA claims under 28 U.S.C. § 1367, as such claims are part of the same case or controversy as Plaintiff's FCRA claims.

29.     The Defendants are subject to the jurisdiction of this Court pursuant to § 48.193, Fla. Stat., and Fed. R. Civ. P. 4(k).

30.     Venue is proper in the Northern District of Florida pursuant to 28 U.S.C. § 1391(b)(2), because the acts complained of were committed and/ or caused by the Defendants within the Northern District of Florida.

## PARTIES

31.     Ms. Davis is a natural person who at all times relevant has resided in Leon County, Florida.

32.     Ms. Davis is a *Consumer* as defined by 15 U.S.C. § 1681a(c) and § 559.55(8), Fla. Stat.

33.     Tomocredit is a Delaware corporation with a principal business address in San Francisco, CA.

34.     Tomocredit's Delaware registered agent is Cogency Global, Inc., 850 New Burton Rd. Suite 201, Dover, DE 19801.

35.     Tomocredit was, at all times relevant, a furnisher of information to multiple CRAs in that it regularly reported account payment and status data on consumer credit lines.

36.    Community Federal is a bank charted in New York and has a primary business address of 8916 Jamaica Ave, Woodhaven, NY 11421.

37.    Community Federal was the issuer of the Tomo Card Mastercard® credit cards, was responsible for monitoring and supervising the Tomo Card program, and bears ultimate responsibility for the actions taken by its agents and servicers.

38.    Trans Union is a Delaware limited liability company, with a principal business address of 555 West Adams Street, Chicago, IL 60661.

39.    Trans Union is registered to conduct business in the State of Florida, where its registered agent is, Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

40.    Experian is an Ohio corporation with a principal business address of 475 Anton Boulevard, Costa Mesa, CA 92626.

41.    Experian is registered to conduct business in the State of Florida, where its registered agent is CT Corporation System, 1200 South Pine Island Road, Plantation, FL 32301.

42.    Trans Union and Experian are CRAs within the meaning of the FCRA, 15 U.S.C. § 1681a(f), in that they for monetary fees, dues, or on a cooperative nonprofit basis, regularly engage in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for

the purpose of furnishing consumer reports to third parties, and use various means of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically including mail and telephone communications.

## FACTUAL ALLEGATIONS

43.    In October 2022, Ms. Davis opened a Tomo Card Mastercard® (the "Account").

44.    The Account was issued by Community Federal, under a license granted by Mastercard® International.

45.    Community Federal was, at all times, the original creditor of the Account and the entity to whom debts concerning purchases made on the Account were payable to.

46.    Community Federal approved Ms. Davis' credit application and received fees each month the account remained open.

47.    Ms. Davis used the Account to make charges for consumer goods and services.

48.    Thus, any balance alleged owed on the Account arose from purchases that were primarily for family, personal, or household purposes, specifically charges for consumer goods and services, and therefore the Account balance meets the definitions of "debt" under the FCCPA, § 559.55(6), Fla. Stat.

49.    In October 2022, Tomocredit's website, Tomocredit.com, prominently advertised "$0 Fees 0% APR" and that "The Tomo card is issued by Community Federal Savings Bank, member FDIC, pursuant to license by Mastercard."

50.    Initially, Tomocredit's website advertised it did no credit checks, although its website was modified in 2022 to say "no credit history required."

51.    To underwrite accounts, Tomocredit used Finicity, a service owned by Mastercard, to obtain the consumer's checking account data and examined the transactions appearing in it to determine eligibility and credit limit.

52.    Because of the high-risk nature of issuing credit cards without credit checks, Tomocredit *required* consumers to pay all charges made to the card via electronic payment every seven days[2].

53.    This should have raised two, huge red flags for Community Federal, the issuer of the Tomo Card accounts and the financial institution to whom payment for charges made to Tomo Card accounts were owed.

54.    First, the Credit Card Accountability Responsibility and Disclosure Act of 2009 ("Credit CARD Act"), amending 15 U.S.C. § 1637, requires that credit card issuers provide accountholders with a written statement of account at least

---

[2] Deep in the fine print of the Tomo Card cardholder agreement, Tomocredit states a cardholder has 21 days to make payment after the statement is issued, but states Tomocredit would "freeze" an account if payment wasn't made within 7 days of statement issue. In reality, Tomocredit considered balances not paid after 7 days delinquent and would send collection e-mails and texts at this point.

*21 days before* payment is due and requires issuers to set the payment due date on the same day each month.

55.    As is axiomatic, requiring accountholders like Ms. Davis to make payments every seven days means that Community Federal nor its agent, Tomocredit, could possibly provide a written statement of account 21 days in advance.

56.    Second, Tomocredit's conditioning of loan approval on the consumer consenting to automatic, electronic payments violates the federal Electronic Funds Transfer Act, 15 U.S.C. § 1693, et seq. ("EFTA"), which states "No person may condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers."

57.    Despite Tomocredit's stark and obvious violations of two highly-relevant, federal statutes, Community Federal nonetheless agreed to be the "bank partner" of Tomocredit and issue Mastercard accounts – and collect fees per account for doing so.

58.    Despite securing $122 Million in venture capital funding, and a $100 Million credit line, Tomocredit quickly ran into financial trouble.

59.    Indeed, Tomocredit could not even pay the vendor who produced the physical credit cards for Tomocredit.

60.    In February 2023, Tomocredit was sued by I.C. Security Printers, Inc. alleging Tomocredit failed to pay over $700,000 for the design, printing, and mailing to Tomo Card Mastercards. The suit alleged considerable acts of bad faith and a scheme to obtain services from I.C. Security Printers, Inc. without paying[3].

61.    The case was settled by Tomocredit, who agreed to pay $40,000 per month toward the debt in installments. However, it soon defaulted these payments and was sued again for breach of contract.

62.    On February 14, 2024, Tomocredit was sued for failure to pay $4,250 concerning legal work to register a trademark concerning Tomocredit in the Superior Court for San Francisco County.

## Tomocredit Makes Obviously-False Reports To Experian

63.    In March 2023, Tomocredit reported to Experian and Trans Union the status of Ms. Davis' Account was "30 days past due," meaning it was at least 30 and as many as 59 days delinquent.

64.    Ms. Davis disputes this is accurate as she made all required payments to Tomocredit in February 2023, meaning she could not be "30 days past due" in March 2023.

---

[3] See *I.C. Security Printers, Inc.-Marketing vs. Tomocredit, Inc.*, case 2:23-cv-00099-JCB, U.S.D.C., Cent. Div. Utah, February 9, 2023.

65.    Tomocredit's own report to Experian illustrates the Account was not past-due.

66.    Tomocredit reported to Experian that for March 2023, the Account balance was $440, $465 of payments had been made, and payment had been received on March 15, 2023 and that the monthly payment was $0.

67.    Clearly, an account with a $0 payment required, and for which $465 of payments on a balance of $440 had been received, cannot be "past due."

68.    In April 2023, Tomocredit reported that the Account was "60 days past due," that the Account balance was $330—of which **$339** was past-due, information which Experian knew, or should have known was, on its face, false, as it contradicts basic common sense.

69.    Despite these and other clear, obvious, and flagrant logical inconsistencies reported by Tomocredit Experian incorporated the data into its file on Ms. Davis, without question.

### Experian Takes No Action Against Tomocredit Despite Non-Compliance

70.    Experian, like its competitor CRAs Trans Union and Equifax, requires its data furnishers to adhere to Metro 2 standards for credit reporting. Metro 2 is a uniform set of reporting standards utilized by large nationwide CRAs for consumer reporting.

71.    Metro 2 standards *require* data furnishers to make monthly updates to balances, payment histories, etc., for any account that does not have a $0 balance.

72.    Tomocredit made no report to Experian in May or June 2023; nonetheless, Experian continued include the Tomocredit tradeline in Ms. Davis' credit file.

73.    Tomocredit's failure to make a normal, monthly, in-cycle report after April 2023 should have further put Experian on notice the data it was reporting was no longer accurate or up-to-date since it no longer complied with Metro 2 requirements.

74.    This should have been especially salient since Tomocredit was reporting accounts as "late" despite having $0 monthly payments, and/or payment history showing more than the balance due was paid, but was still somehow "late."

<u>**Tomocredit Makes Unlawful Collection Attempts On Non-Existent Debt**</u>

75.    On August 7, 2023, Tomocredit emailed Ms. Davis attempting to collect $212.57 from her, titled in large red letters "Your Account is Default".

76.    The collection email went on to state:

"Your account is currently with our third party collections partner; TrueAccord. Make immediate payment in full to prevent your account from being Charged Off status. Your account is at risk of charge off at any time. We have told a credit bureau about a late

payment, missed payment or other default on your account. This information may be reflected on your credit report. They can be reached by email at support@trueaccord.com or by phone at 866.611.2731."

77.    True Accord is a Florida-licensed debt collection agency based in Lenexa, Kansas.

78.    However, at no point did Tomocredit place the Account with True Accord for collection, and instead it apparently used the name of a well-known debt collector to deceive consumers like Ms. Davis that a collection agency was now involved.

79.    Tomocredit was aware that many consumers would perceive the "involvement" of a collection agency as an event which could further negatively impact their credit report and scores, and/or result in legal action being taken against them. They knew that this was a pressure point for many of the consumers who utilized Tomocredit based on its no-credit-score-needed business model.

80.    At this point in time, Ms. Davis did not owe anything to Tomocredit.

81.    Nonetheless, Tomocredit continued to initiate electronic withdrawals.

82.    Tomocredit sent virtually identical emails to other consumers besides Ms. Davis, which also falsely claimed balances had been transferred to True Accord for collection when they had not. See, e.g. *Brown v. Tomocredit Inc. et al*, case

8:2024cv00496, M.D. Fla., February 26, 2024 (claims of referring debt to True Accord).

### Tomo Card Program Discontinued In Late 2023

83.     Due in large part to Tomocredit's increasing non-compliance with various state and federal statutes, Community Federal discontinued the origination of new Tomo Card accounts around September 2023.

84.     As a result, Tomocredit – now *sans* bank partner – informed its current cardholders that "We have paused our credit card for the foreseeable future."

85.     This created considerable problems for consumers who had a credit balance on their Tomo Card (for example, due to a refund issued by a merchant) since those consumers had no way to spend the money or utilize the funds through a check or wire transfer.

86.     According to multiple complaints filed with the BBB and Consumer Financial Protection Bureau ("CFPB"), Tomocredit simply kept the consumer's money.

87.     For example, on consumer complained to the CFPB in May 2024 (eight months after Tomo Card stopped working) that they still had $140 owed to them from a merchant credit, despite emailing and calling Tomocredit's customer service multiple times.

88.    Additionally, Tomocredit continued to advertise is Tomo Card Mastercard® on its website[4], with a large green "Apply Now" button.

**Tomocredit Starts Dubious 'TomoBoost' Credit Repair Service**

89.    After Community Federal stopped originating new Tomo Card accounts, Tomocredit then adopted a two-pronged strategy for survival.

90.    First, it began even more hyper-aggressive measures to collect remaining outstanding balances on old Tomo Card accounts, even though in many circumstances nothing was owed, or less was owed than what Tomocredit claimed.

91.    Second, it began aggressively marketing a new credit repair service called "TomoBoost."

92.    TomoBoost offered to report fake accounts with years' worth of backdated payment history and very high credit limits as tradeline data to Equifax, Experian and Trans Union, thus allowing credit-challenged consumers to "boost" their credit scores, as Tomocredit claimed, by hundreds of points.

93.    For fees as high as $199 per month, Tomocredit would report to the CRAs that the consumer had a revolving line of credit with a $30,000 limit that had been open and active for two years, even though the account had just been opened that month and the $30,000 limit could not be used to purchase anything.

---

[4] See https://tomocredit.com/thecard, accessed August 29, 2024.

94.    Part of this marketing involved sending large numbers of text messages to existing customers, claiming this product would "fix" their bad credit and significantly improve their credit scores.

95.    As explained in more detail below, many of these advertising text messages were sent very late at night or even after midnight, despite Florida law strictly regulating the hours advertising communications like this could be made.

96.    CRA's like Trans Union and Experian prohibit reporting fabricated data such as TomoBoost – even if the information potentially helps the consumer – since the purchaser of credit reports are relying on the information in those reports being accurate.

97.    Products like TomoBoost inherently undermine the integrity and usefulness of consumer credit reports.

98.    TomoBoost was boasted by the Defendant as "a product we developed to help increase credit scores FAST" and Tomocredit claimed "we have had users boost over 150 points!" https://tomocredit.com/boost-faq, accessed August 29, 2024.

99.    For $199.99 – which TomoBoost sometimes discounts to $99.99 – a consumer can purchase a $10,000 "line of credit" from Tomocredit, which it then reports to the CRAs as a credit card account with a $10,000 limit.

100.   Tomocredit then backdates the reporting by 24 months, so that the individual appears to have already had this "credit card" open for two years, thereby "boosting" the consumer's credit score since it would appear the consumer has had a high-limit account, paid as agreed, for 24 months continuously.

101.   Tomocredit advertises this $10,000 "limit" can be increased to $30,000 for additional fees.

102.   The TomoBoost "credit card" accounts reported to the CRAs cannot be used in the real world for any kind of financial transaction whatsoever, and serve zero purpose beyond the intended effect it has on a person's credit.

103.   Tomocredit's website makes plainly clear the entire purpose of TomoBoost is to improve credit scores *vis-à-vis* fabricated credit card limits; the consumer is required to pay the $199.99 fee in advance for this service.

104.   Tomocredit is fully aware its "TomoBoost" product is provides no service other than to deceptively inflate a consumer's credit score.

105.   Tomocredit CEO Kristy Kim, told a FinTech blogger that "internally, we describe our product as a better version of Lexington Law."[5]

106.   Lexington Law was one of the largest credit repair services in the United States, and engaged in dubious and often unlawful practices, resulting in

---

[5] https://workweek.com/2023/11/17/one-last-time/, Alex Johnson, November 17, 2023.

the United States Consumer Financial Protection Bureau securing a $2.7 billion judgment against it in August 2023.

107.    Around October 2023, Experian and Equifax, two of the three large nationwide CRAs, terminated Tomocredit's subscriber account and deleted all of Tomocredit's tradelines from their files.

108.    Trans Union was the outlier, and did not terminate Tomocredit's subscriber account until sometime in or about April 2024. Trans Union continued to include Tomocredit tradelines in consumer reports it sold up through that date, despite the clear evidence that Tomocredit certainly wasn't a reliable source for accurate credit data.

### Tomocredit Reports Duplicate Tradelines To Collect Dubious Debt

109.    Around October 2023 – right after Tomocredit's ability to generate new credit card accounts was materially cut off from the other bureaus, Tomocredit began reporting *two* different tradelines to Trans Union concerning Ms. Davis' single Tomocredit account.

110.    In other words, Tomocredit wasn't just reporting to Trans Union that Ms. Davis had a purported charged-off balance on a bogus credit card account, it was reporting that she had two charged-off balances on two bogus credit card accounts.

111.    Tomocredit never allowed any consumer to have more than one Tomo Card account, and Ms. Davis certainly did not have two accounts.

112.    The duplicate reporting was not limited to Ms. Davis, and instead was part of a pattern of reporting false information to Trans Union to attempt to collect revenue by intentionally reporting inaccurate credit report data.

113.    The duplicate tradelines appearing on Ms. Davis's report were not some isolated, one-off incident, but rather a pattern of intentional behavior by Tomocredit. See, e.g., *Averill Blanchard vs. TransUnion LLC and TomoCredit, Inc.*, W.D. Penn., case 2:23-cv-02158-RJC, December 26, 2023 (duplicate Tomocredit tradelines reported to Trans Union; verified as accurate by Tomocredit upon dispute by consumer).

114.    A January 23, 2024 consumer complaint to the BBB (never answered by Tomocredit) complained that "I have tried contacting (Tomocredit) as to why on my credit report it shows to open accs [sic] and one with over $700 balance, I have one card with them with a limit of $250 and the card has not been used in months and remains with no current balance."

115.    Reporting a debt to a CRA is an attempt to collect that debt. *Denan v. Trans Union LLC*, No. 19-1519, at *6 (7th Cir. May 11, 2020)(" Consumer reporting agencies and furnishers, though interrelated, serve discrete functions: furnishers

report data to incentivize the repayment of debts, while consumer reporting agencies compile and report that data for a fee.")

116.    Ms. Davis's December 13, 2023, Trans Union credit report shows the first tradeline iteration contains a "date reported" of August 28, 2023, and indicated $212 was "charged off" and "in collection," with an "amount past due" of $219 despite a current balance of $212.

117.    A second account showed $291 past-due as of June 28, 2023, with a status of "120-149 days past due."

118.    Logically, to be at least 120 days past due as of June 28, 2023, payment would have to have been delinquent at some point between January 30, 2023 and February 28, 2023.

119.    Yet, Tomocredit reported an account balance of $440 in March, payment received March 15, 2023, and payment in the amount of $465, meaning Ms. Davis had overpaid Tomocredit $25 in March 2023.

120.    Despite both tradelines clearly referring to the same account, both tradelines clearly not being updated within the last 30 days, and both tradelines containing contradictory information concerning the amount supposedly owed, and one iteration claiming $219 was past due on an aggregate $212 debt; Trans Union incorporated the data into Ms. Davis's credit file and included it in reports sold about her.

121.    Simultaneous to this, and despite reporting to Trans Union that Ms. Davis was past-due on *two* accounts, Tomocredit sent Ms. Davis' text messages telling her she had a $100 *credit* she could use for "credit repair" services:



122.    Again, logically, if Ms. Davis "owed" money to Tomocredit, then she would not, simultaneously, have a $100 of "unused" credits with it.

### Both Tomocredit and Trans Union Fail To Investigate Disputes

123.    Around January 2024, Ms. Davis applied for a mortgage to finance a house through a program which helps provide down-payment assistance to school teachers who seek to become first-time homebuyers like herself.

124.    After being learning that two "charged off" Tomo Card accounts were appearing on her Trans Union credit report from a loan officer, Ms. Davis disputed the Tomocredit account to Trans Union.

125.    Ms. Davis stated in her dispute that the balance was not accurate as everything owed had been paid, and, moreover, the same account was appeared on her report twice in an improper way.

126.    Trans Union, upon receipt of Ms. Davis's disputes, sent Tomocredit an *Automated Consumer Dispute Verification* Request ("**ACDV**") through a system known as e-OSCAR, requesting that Tomocredit make a reasonable investigation into the dispute.

127.    Tomocredit responded to the ACDV and indicated that the previously reported information was accurate and required no update, modification or deletion.

128.    Tomocredit did "update" the date it last reported the charged-off account to December 28, 2023.

129.    Nonetheless, Tomocredit made no relevant changes to any of its reporting to Trans Union.

130.    Tomocredit did not report the Account information as "disputed by consumer" or "account in dispute under FCBA."

131.    Had Tomocredit reported a compliance condition code ("CCC") of "XC," for "account information disputed by consumer," or "XF," for "account in dispute under Fair Credit Billing Act," Trans Union would have at least updated its file on Ms. Davis to indicate the Tomocredit Account was disputed.

132.    In cooperation with the major CRAs, the Consumer Data Industry Association ("CDIA") publishes the Metro 2 reporting standards to assist furnishers with their compliance requirements under the FCRA. CDIA's reporting

products are used in more than nine billion transactions each year. *See* http://www.cdiaonline.org/about/index.cfm?unItemNumber=515.

133.    Equifax, Trans Union, and Experian require all data furnishers, such as Tomocredit, to report data according to Metro 2 standards.

134.    Yet, Tomocredit did not adhere to Metro 2 standards when it failed to report any CCC whatsoever.

135.    Failing to report a CCC of "XB" or "XF" has significant consequences for the consumer, including the fact that many consumer credit scores, including almost all versions of FICO®, the most commonly-used credit scores in the nation, will disregard credit card accounts reported with a CCC code of "XB" or "XF".

136.    Tomocredit failed to conduct a reasonable investigation into Ms. Davis's dispute, as any reasonable investigation would have concluded:

a.    the Account balance was inaccurate as it was not owed;

b.    the Account data was disputed by Ms. Davis; and

c.    two tradelines had been reported about a single account.

137.    Subsequent disputes in February 2024 and March 2024 resulted in almost the same results occurring – Trans Union's investigation consisted of nothing more than sending ACDVs to Tomocredit, which somehow verified two tradelines should report and that both should have different balances owed, and have different payment statuses.

## Trans Union's Fails To Investigate Obvious Inaccuracies

138.    Trans Union was also required to make a parallel, reasonable investigation into Ms. Davis's disputes. *See* 15 U.S.C. § 1681i.

139.    However, Trans Union relied solely upon the ACDVs furnished to it by an untrustworthy data furnisher like Tomocredit to replace its on "reinvestigation."

140.    Trans Union's dispute resolution systems are heavily tilted in favor of its data furnishers, from whom it receives revenue monthly, and rests on the premises the data furnishers are always right, until categorically proven wrong by the consumer.

141.    As a result, consumers like Ms. Davis are left in a scenario where their only way to have their credit report corrected rests on their ability to disprove a negative.

142.    For nearly 40 years, courts in this district have recognized that a CRA cannot rely upon its data furnisher exclusively, when the consumer disputes the accuracy of the furnisher's version of events and provides evidence to the contrary. The CRA must make some independent investigation of its own. "Merely reporting whatever information the creditor furnished was not reasonable, especially where the defendant knew of the impending dispute between the

[consumer] and [data furnisher]." *Swoager v. Credit Bureau of Greater St. Petersburg*, 608 F. Supp. 972 (M.D.Fla.1985).

143.    If the CRA knows or should know that the furnisher is unreliable, then a "reasonable reinvestigation" may require verifying the accuracy of the furnisher's information directly. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

144.    Trans Union had many reasons to know Tomocredit was not a reliable furnisher of data when it received disputes from Ms. Davis in January, February and March 2024; and of course, when Trans Union itself was a named defendant in a lawsuit filed in December 2023 alleging Tomocredit reported duplicate tradelines and verified both as accurate in a set of facts almost identical to those of Ms. Davis.

145.    Moreover, Trans Union knew—or should have known, from the thousands of fake TomoBoost tradelines flooding its systems – that Tomocredit could categorically not be trusted as a source of information, in light of the facts its credit card business was effectively terminated, and its only source of revenue was selling subscriptions to a service which intentionally reports false data to the CRAs to "boost" a consumer's credit score.

146.    As basic common-sense dictates, a person engaged in selling false data to the CRAs can inherently *not* be trusted or considered a "reputable" source of information.

147.    Trans Union failed to conduct a reasonable investigation into Ms. Davis's disputes, as any reasonable investigation would have concluded that data reported by a company which openly sells a service reporting fake credit card tradelines to the CRAs and which reports logically-contradictory information cannot reasonably be verified.

148.    Despite FCRA lawsuits and voluminous consumer disputes concerning duplicate tradeline reporting, Trans Union continued reporting both tradelines to Ms. Davis's credit file until April 2024, when Trans Union finally deleted all of Tomocredit's account data from its databases.

### Additional Attempts to Collect Disputed Debt by Tomocredit

149.    On or around August 7, 2023, Tomocredit, as agent for Community Federal, emailed Ms. Davis, stating in large type "Your Account is Default (SIC)" and that her account required immediate payment of $212.57 to "prevent your account from being Charged Off status (SIC)."

150.    Tomocredit sent the identical email at least four more times to Ms. Davis over the next 10 days.

151.    All of the emails misrepresented that the account was transferred to TrueAccord for collection.

152.    On August 31, 2023 Tomocredit, as agent for Community Federal, emailed Ms. Davis stating with a subject header "Avoid LEGAL ACTION" and stating in the body of the email, "Failure to satisfy your obligation may result in legal action through our 3rd party legal debt collection firm."

153.    Tomocredit's statement is patently false, as Tomocredit at no point utilized any "3rd party legal debt collection firm."

154.    A search of public records shows a number of lawsuits filed *against* Tomocredit, but also a dearth of lawsuits filed by Tomocredit against consumers in an effort to enforce a debt.

155.    On November 3, 2023, Tomocredit emailed Ms. Davis with the subject header "Delete October Delinquency Reporting," and stated that "If you pay your $192.57 balance by 11/6/23 midnight PST, we will delete delinquency reporting to the credit bureaus for the month of October."

156.    Tomocredit's email was false and misleading for the following reasons:

    a.  It did not report any delinquency to the CRAs for October 2023, and thus there was no October 2023 "delinquency" to delete.

b.  By October 2023, Equifax and Experian had already deleted all Tomocredit tradelines.

c.  Tomocredit could not delete anything from a CRAs file, but rather could only request deletion under certain circumstances—and Trans Union, like its competitor CRAs, prohibits requesting deletion of previously-reported late payment history in exchange for payment.

157.  Tomocredit stated in its email that $192.57 was owed, yet reported to Trans Union that, alternately, $212, $219, and $291 was the balance due.

158.  Tomocredit verified these amounts as accurate upon dispute, despite their contradiction by its own, direct communications to the Plaintiff.

159.  On November 6, 2023, Tomocredit emailed Ms. Davis, with the subject header "*13 HRS to DELETE DELINQUENCY*" with a picture of a "delinquency" going into a trash can.

160.  The email claimed that $182.57 was owed, e.g., $10 less than it had claimed three days earlier.

161.  Tomocredit sent some of its emails to Ms. Davis prior to 8 a.m. or after 9 p.m., in contradiction to the FCCPA's requirements.

162.  At this point, Tomocredit claimed within the month of November 2023, that for a single account where no interest nor payments were assessed, $182.57, $192.57, $212, $219, or $291 was owed. These various balances were all

communicated in connection with collection via e-mail and credit reporting (while simultaneously blasting Ms. Davis with text messages advising she had a $100 *credit* with Tomocredit to spend on its credit repair services).

163.    Tomocredit has also sent emails to consumers with small past-due amounts, claiming the failure to pay could result in "asset seizure," a 100 point drop of credit scores, and one that noted it was – somehow – illegal under United States law not to repay Tomocredit debts. See, e.g., *Arami Brown vs. Tomocredit Inc. et. al*, case 8:24-cv-00496-MSS-CPT, M.D. Fla, January 2024.

164.    After Ms. Davis paid her Tomo Card balance in full, Tomocredit continued to initiate Automated Clearing House ("ACH") debits from Ms. Davis's Cash App account[6].

165.    At no point did Ms. Davis provide authorization for Tomocredit to initiate ongoing ACH debits from her Cash App account.

166.    Thus, at no point did Tomocredit provide Ms. Davis a copy of such authorization.

167.    Further, Tomocredit had no right to initiate ACH debits from her Cash App account as nothing was owed to it.

---

[6] The CPFB clarified in 2021 that peer-to-peer payment networks, like Cash App, are "financial institutions" for purposes of the EFTA and transactions concerning them are subject to its regulations.

168.    Tomocredit has initiated over 30 ACH withdrawal attempts since December 28, 2023 from Ms. Davis' Cash App account.

169.    Because Ms. Davis neither authorized the electronic payment withdrawals nor did Tomocredit have any legal reason to initiate the withdrawal, each ACH debit attempt violated  15 U.S.C. § 1693e(a).

170.    The ACH network is administered by the National Automated Clearing House Association ("NACHA"), which implements numerous requirements which users of the network must adhere to.

171.    According to these rules, if two consecutive attempts to collect a payment via ACH debit are unsuccessful due to insufficient funds or other reasons, the creditor must not initiate further attempts[7].

172.    Despite this "two-and-done" bright line, Tomocredit has made over 30 attempts to withdraw funds in a row, each and every one of which was unsuccessful, including one attempted on August 25, 2024.

173.    The frequency of which Tomocredit violated the EFTA establishes willful violation of the Act.

### Tomocredit Bombards Ms. Davis With Advertising Text Messages

---

[7] NACHA Operating Rules, Section 2.12.4 (Reinitiation of Entries).

174.    Fla. Stat. § 501.059(8)(a) defines a telephonic sales call, in pertinent part, as "a telephone call, text message, or voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services."

175.    "Consumer goods and services" are defined as "real property or tangible or intangible personal property that is normally used for personal, family, or household purposes(.)" *See* Fla. Stat. § 501.059(1)(c).

176.    Telephone sales calls outside the hours of 8 a.m. to 8 p.m local time are prohibited and prohibits more than three calls within a 24 hour period. *See* Fla. Stat. § 501.616(6)(a).

177.    Despite these restrictions, Tomocredit often sent more than three text messages a day to Ms. Davis's cell phone, advertising its "TomoBoost" service in which Tomocredit would, supposedly, report fake positive tradeline data to Equifax, Experian and Trans Union in order to artificially boost the consumer's credit scores.

178.    Tomocredit also sent text messages well outside of 8 a.m. to 8 p.m., including a message at 12:59 a.m. on December 11, 2023, one at 7:30 a.m. on December 9, 2023, and one at 10:22 p.m. on January 4, 2024.

179.    All of these messages came from (415) 200-1748, a number which belongs to, or is regularly utilized by, Tomocredit.

180.   Tomocredit has also been sued for sending collection communications well past the 9 p.m. cut-off allowed by the FCCPA; see, e.g. *Tunisia Bringnol et. al vs. Tomocredit, Inc.*, Miami-Dade County, Florida, July 19, 2023 (multiple collection communications sent slightly after midnight EST).

181.   Tomocredit's sending of text messages after-hours was willful, intentional, and consistent with its prior business practices of communicating with consumers at all hours of the day (and night), irrespective of law prohibiting this.

182.   Ms. Davis has suffered emotional distress from being continuously hounded for payment of a debt she does not owe and for which Community Federal – a chartered bank insured by the FDIC – hired incompetent agents to service, without adequate supervision.

183.   At all times relevant, Tomocredit was acting as an agent for Community Federal Bank, the original creditor of the account, who stood to receive at least some portion of funds recovered from consumers on delinquent Tomo Card accounts.

184.   Community Federal had a duty of care to ensure that products which bore its name and logo, like the Tomo Card Mastercard, and for which it had a legal duty to ensure compliance with state and federal laws concerning, were managed by competent, law-abiding partners.

185.    Community Federal saw the Tomocard "partnership" as a quick, seemingly risk-free way to gain additional revenue, and disregarded a host of warning signs that Mastercard® accounts bearing its name as issuer were being flagrantly mismanaged (or worse) by Tomocredit.

186.    Community Federal was well aware of not just of the risk of harm this created to Ms. Davis, but the virtual certainty it would harm Ms. Davis and thousands of other consumers like her.

187.    Indeed, the presence of the false Tomocredit tradelines on Ms. Davis's credit reports contributed to Ms. Davis's inability to obtain financing for her home purchase and other credit opportunities.

188.    At all times relevant, Tomocredit was acting as an agent and servicer for Community Federal, and was acting under the scope and authority of agency granted to it by Community Federal.

189.    As principal, Community Federal is liable for the actions of its agent, Tomocredit.

190.    The Plaintiff has suffered harm as a result of the foregoing actions. She has wasted time trying to dispute the inaccurate information. Her right to peace and seclusion from harassment, especially during nighttime hours, was violated. Her credit was unfairly damaged, and the inaccurate information was transmitted to third parties who viewed her more negatively as a result. She has

suffered from anxiety, fear, hopelessness, anger, and frustration from the repeated, harassing collection communications and failed dispute investigations.

## CLASS ACTION ALLEGATIONS

191.  Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for herself and on behalf of the following classes of which she is a member, initially defined as:

> **All consumers: who had duplicate Tomocredit tradelines appear on their Trans Union credit reports, and/or had information appear on their Trans Union or Experian report which was on-its-face false (e.g., a past-due amount which exceeded the total balance claimed owed), and/or are residents of Florida and were subjected to collection communications prior to 8 a.m. or after 9 p.m., and/or who received advertising text messages or phone calls after 8 p.m. but before 8 a.m. local time, and/or received collection communications from Tomocredit concerning amounts not owed, or which overstated the amount owed, and/or which expressed an assertion of legal rights which do not exist (e.g., asset seizure without due process), and/or had electronic payments initiated from one or more account without authorization and/or were not provided a copy of the electronic funds authorization by Tomocredit.**

192.  Excluded from the Class are the Defendants and any of their officers, directors, and employees.

193.  Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

## The Trans Union Class

194.    Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for herself and on behalf of the following classes of which she is a member, initially defined as**:**

> **All consumers whose Trans Union credit report contained two or more tradelines concerning Tomo Card accounts simultaneously, and/or which contained a single Tomo Card account with logically-impossible information such as a past-due balance exceeding the total balance owed ("Trans Union Class").**

195.    Dispute sub-class:

> **All consumers whose Trans Union credit report contained two or more tradelines concerning Tomo Card accounts simultaneously, who submitted a dispute to Trans Union which resulted in both iterations of the Tomo Credit tradelines being verified as accurate ("Trans Union Dispute Sub-Class").**

196.    Excluded from the Trans Union Class and Trans Union Dispute Sub-Class are the Defendants and any of their officers, directors, and employees.

197.    Plaintiff reserves the right to modify or amend the Trans Union Class and Trans Union Dispute Sub-Class definition before the Court determines whether certification is appropriate.

## The Experian Class

198.    Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for herself and on behalf of the following classes of which she is a member, initially defined as**:**

**All consumers whose Experian credit report contained two or more tradelines concerning Tomo Card accounts simultaneously, and/or which contained a single Tomo Card account with logically-impossible information such as a past-due balance exceeding the total balance owed ("Experian Class").**

199.  Excluded from the Experian Class are the Defendants and any of their officers, directors, and employees.

200.  Plaintiff reserves the right to modify or amend the Experian Class definition before the Court determines whether certification is appropriate.

## The FCCPA Class

201.  Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for herself and on behalf of the following class of which she is a member, initially defined as**:**

**All consumers who live in Florida, or who lived in Florida at any time relevant, who received collection e-mails, texts, or other communications after 9 p.m. or before 8 a.m. local time, or who received any of the false and misleading collection emails referenced in this lawsuit, or who were subject to electronic payment withdrawal attempts (successful or not) without having authorized the transactions *and* receiving a copy of the authorization ("FCCPA Class").**

202.  Excluded from the FCCPA Class are the Defendants and any of their officers, directors, and employees.

203.    Plaintiff reserves the right to modify or amend the FCCPA Class and definition before the Court determines whether certification is appropriate.

## Information Relating To All Classes:

204.    **Numerosity.  Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical.  Tens of thousands of accounts were issued by the Tomocredit and reported to the CRAs and subject to collection activity by Tomocredit within the last 24 months. Tomocredit has made, likely, millions of individual EFT withdrawal attempts in the last 12 months. Tomocredit has sent what is likely hundreds of thousands, if not millions, of text messages advertising TomoBoost to Florida residents after the hours of 8p.m and before 8 a.m. Class members are spread throughout the state of Florida and the United States. Although the precise number of Class members is unknown, on information and belief, there are at least 10,000 members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants.  The class members may be notified of the pendency of this action by published, e-mailed, or mailed notice.

205.    **Existence and Predominance of Common Questions of Law and Fact.  Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the Class which predominate over questions affecting any individual class member.  Specifically, these common questions include, without limitation: (a)

whether the Class members' alleged debts constitute a *Consumer Debt*; (b) whether Tomocredit and Community Federal violated § 559.72(9) of the FCCPA by attempting to enforce debts not owed in full or in part; (c) weather Tomocredit's sending of text messages after 8 p.m. and before 8 a.m. local time constitutes a violation of the FTA, (d) weather Experian and Trans Union's inclusion of Tomocredit tradelines in consumer reports violated the FCRA, (e) weather Trans Union's inclusion of duplicate Tomocredit tradelines in consumer reports violated the FCRA, and (f) weather Trans Union's investigations from consumers who disputed duplicate tradelines without at least one tradeline being deleted were reasonable under the FCRA.

206. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. Text messages received at any time after 8 p.m. but before 8 a.m. local time constitute a *per se* violation of the FTA. In the subclass of consumers whose Trans Union credit reports contained duplicate tradelines, the harm is essentially the same—negative data was duplicated without legitimate reason and impacted the consumer's credit worthiness. Plaintiff has no interest adverse or antagonistic to the interests of other members of the Class and has the same claims for statutory damages that she seeks for members of the Class.

207. **Adequacy of Class Representation.  Fed. R. Civ. P. 23(a)(4).**  Plaintiff is an adequate representative of the Class and will fairly and properly protect the interests of the Class.  Plaintiff has retained experienced counsel who has litigated well over two thousand consumer cases under federal and state consumer protection statutes, including a great number under the FCRA, CRCPA, and FCCPA. Plaintiff's counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously.  Plaintiff and her counsel will fairly and adequately protect the interests of members of the Class.

208. **Predominance and Superiority.  Fed. R. Civ. P. 23(b)(3).**  Questions of law and fact common to the Class members predominate over questions affecting only individual Class members.  Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of the FCRA, FTA and FCCPA.  It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court

system presented by the legal and factual issues raised by the Defendants' conduct.

209.    **Injunctive Relief Appropriate for the Defendants, Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have and continue to act on grounds generally applicable to the class, making appropriate injunctive relief with respect to Ms. Davis and the Class members. Ms. Davis and the putative class seek an injunction prohibiting the Defendants from continued collection of amounts not owed, as well as from making sales calls after 8 p.m. local time, as prescribed by law.

**COUNT I**
**WILLFUL VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681s-2(b)**
**Tomocredit Only**

210.    Ms. Davis hereby incorporates paragraphs 1 – 209 as if fully stated herein.

211.    Tomocredit violated **15 U.S.C. § 1681s-2(b)** when it failed, on at least three separate occasions, to conduct a reasonable investigation after receiving notice of dispute of the Account from Trans Union, as any reasonable investigation would have concluded that the Account could not be verified as accurate, as it contained amounts not owed and, moreover, Tomocredit was furnishing information about two accounts to Trans Union when only one account ever

existed. A reasonable investigation would have also resulted in the accounts being reported as "disputed."

212. Tomocredit's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, when clearly disputed.

213. Tomocredit's conduct was thus willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to make reasonable investigations, and its policies could reasonably be foreseen to cause harm to Ms. Davis.

214. Accordingly, pursuant to 15 U.S.C. § 1681n, Tomocredit is liable to Ms. Davis for the greater of her actual damages and statutory damages of up to $1,000 for *each occurrence*, as well as punitive damages, reasonable attorney's fees, and costs.

215. Alternatively, Tomocredit's conduct was the result of negligence, and pursuant to 15 U.S.C. § 1681o, Tomocredit is liable to Ms. Davis for her actual damages, as well as her reasonable attorney's fees, and costs.

**WHEREFORE,** Ms. Davis respectfully requests this Honorable Court to enter judgment against Tomocredit for:

a. The greater of statutory damages of $1,000 per incident or Ms. Davis's actual damages, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.    Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681n(a)(3), and,

d.    Such other relief that this Court deems just and proper.

## COUNT II
## NEGLIGENT VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681s-2(b)
## Tomocredit Only
## Plead In The Alternative To Count I

216.    Ms. Davis hereby incorporates paragraphs 1 – 209 as if fully stated herein and pleads this count strictly in the alternative to Count I.

217.    Tomocredit violated **15 U.S.C. § 1681s-2(b)** when it failed, on at least three separate occasions, to conduct a reasonable investigation after receiving notice of dispute of the Account from Trans Union, as any reasonable investigation would have concluded that the Account could not be verified as accurate, as it contained amounts not owed and, moreover, Tomocredit was furnishing information about two accounts to Trans Union when only one account ever existed. A reasonable investigation would have also resulted in the accounts being reported as "disputed."

218.    Tomocredit's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, when clearly disputed.

219.    Tomocredit owed Ms. Davis a legal duty to utilize reasonable procedures to investigate disputes it received via a CRA.

220.    Tomocredit breached this duty when it failed to make a reasonable investigation, multiple times.

221.    Tomocredit's thus acted negligently, and Ms. Davis is entitled to her actual damages, attorneys' fees, and costs, pursuant to 15 U.S.C. § 1681o.

**WHEREFORE,** Ms. Davis respectfully requests this Honorable Court to enter judgment against Tomocredit for:

a.    Actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681o(a)(2); and,

c.    Such other relief that this Court deems just and proper.

## COUNT III
## WILLFUL VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(1)(A)
## Trans Union Only

222.    Ms. Davis hereby incorporates paragraphs 1 – 209 as if fully stated herein.

223.    Trans Union violated **15 U.S.C. § 1681i(a)(1)(A)** when it failed to conduct a reasonable investigations into multiple disputes of the duplicated Tomocredit tradelines by Ms. Davis, since any reasonable investigation would have concluded that the Tomocredit accounts could not be verified as accurate as

they contained logically-impossible information, duplicated information, and perhaps most importantly, had been furnished by a source of information known to be highly disreputable.

224. Trans Union's conduct was a result of its regular policies and procedures whereby Trans Union relies solely on the data furnisher's investigation, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, or previously disputed, when still disputed.

225. Trans Union's conduct was thus willful and intentional.

226. Accordingly, pursuant to 15 U.S.C. § 1681n, Trans Union is liable to Ms. Davis for statutory damages of up to $1,000 for *each occurrence*, as well as punitive damages, reasonable attorney's fees, and costs.

**WHEREFORE,** Ms. Davis respectfully requests this Honorable Court to enter judgment against Trans Union for:

a. The greater of statutory damages of $1,000 per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b. Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c. Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3); and,

d. Such other relief that this Court deems just and proper.

<u>**COUNT IV**</u>
<u>**NEGLIGENT VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(1)(A)**</u>
<u>**Trans Union Only**</u>
<u>**Plead In The Alternative To Count III**</u>

227.   Ms. Davis hereby incorporates paragraphs 1 – 209 as if fully stated herein and pleads this count strictly in the alternative to Count III.

228.   Trans Union violated **15 U.S.C. § 1681i(a)(1)(A)** when it failed to conduct a reasonable investigations into multiple disputes of the duplicated Tomocredit tradelines by Ms. Davis, since any reasonable investigation would have concluded that the Tomocredit accounts could not be verified as accurate as they contained logically-impossible information, duplicated information, and perhaps most importantly, had been furnished by a source of information known to be highly disreputable.

229.   Trans Union's conduct was a result of its regular policies and procedures whereby Trans Union relies solely on the data furnisher's investigation, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, or previously disputed, when still disputed.

230.   Trans Union's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, when clearly disputed.

231.    Trans Union owed Ms. Davis a legal duty to utilize reasonable procedures to investigate disputes it received from a consumer.

232.    Trans Union breached this duty when it failed to make a reasonable investigation, multiple times.

233.    Trans Union thus acted negligently, and Ms. Davis is entitled to her actual damages, attorneys' fees, and costs, pursuant to 15 U.S.C. § 1681o.

**WHEREFORE,** Ms. Davis respectfully requests this Honorable Court to enter judgment against Trans Union for:

a.    Ms. Davis's actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681o(a)(2); and,

c.    Such other relief that this Court deems just and proper.

## COUNT V
## WILLFUL VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681e(b)
## Trans Union Only

234.    Ms. Davis adopts and incorporates paragraphs 1 – 209 as if fully stated herein.

235.    Trans Union violated **15 U.S.C. § 1681e(b)** when it failed to follow reasonable procedures to assure maximum possible accuracy of consumer reports sold regarding Ms. Davis when Trans Union sold consumer reports containing duplicate Tomocredit tradelines, which reported logically-impossible

information, and contained allegations of debt owed which was not owed, and Trans Union continued to include this information even after repeated, meritorious disputes by Ms. Davis. Trans Union was also aware that Tomocredit was disreputable for many reasons, including the fact it was advertising a credit repair service in which it would report false information to Trans Union for a fee.

236.   Trans Union's conduct was willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to provide reports with maximum possible accuracy.

237.   As a result of its conduct, Trans Union is liable to Ms. Davis pursuant to the FCRA for the greater of Ms. Davis' actual damages or statutory damages of up to $1,000 for *each occurrence*, punitive damages, reasonable attorneys' fees, and costs, per 15 U.S.C. § 1681n.

**WHEREFORE**, Ms. Davis respectfully requests this Honorable Court enter judgment against Trans Union for:

a.   The greater of Ms. Davis' actual damages or statutory damages of $1,000 per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.   Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3); and,

d.   Such other relief that this Court deems just and proper.

## COUNT VI
## NEGLIGENT VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681e(b)
## Trans Union Only
### (Pled in the Alternative to Count V)

238.   Ms. Davis adopts and incorporates paragraphs 1 – 209 as if fully stated herein, and pleads this count strictly in the alternative to Count V.

239.   Trans Union violated **15 U.S.C. § 1681e(b)** when it failed to follow reasonable procedures to assure maximum possible accuracy of the consumer reports sold regarding Ms. Davis containing duplicate Tomocredit tradelines, which reported logically-impossible information, and contained allegations of debt owed which was not owed, and Trans Union continued to include this information even after repeated, meritorious disputes by Ms. Davis. Trans Union was also aware that Tomocredit was disreputable for many reasons, including the fact it was advertising a credit repair service in which it would report false information to Trans Union for a fee..

240.   Trans Union owed Ms. Davis a legal duty to utilize reasonable procedures to assure the maximum possible accuracy of its consumer reports regarding Ms. Davis.

241.    Trans Union breached this duty when it sold consumer reports containing information false information furnished by Tomocredit.

242.   Trans Union thus acted negligently, and Ms. Davis is entitled to her actual damages, attorneys' fees, and costs, pursuant to 15 U.S.C. § 1681o.

**WHEREFORE**, Ms. Davis respectfully requests this Honorable Court enter judgment against Trans Union for:

a.    Actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681o(a)(2); and

c.    Such other relief that this Court deems just and proper.

**COUNT VII**
**WILLFUL VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681e(b)**
**Experian Only**

243.    Ms. Davis adopts and incorporates paragraphs 1 – 209 as if fully stated herein.

244.    Experian violated **15 U.S.C. § 1681e(b)** when it failed to follow reasonable procedures to assure maximum possible accuracy of consumer reports sold regarding Ms. Davis when Experian sold consumer reports containing Tomocredit's tradeline, which reported logically-impossible information and was non-compliant with Metro 2 reporting standards. Experian was also aware that Tomocredit was disreputable for many reasons, including the fact it was advertising a credit repair service in which it would report false information to Experian for a fee.

245.   Experian's conduct was willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to provide reports with maximum possible accuracy.

246.   As a result of its conduct, Experian is liable to Ms. Davis pursuant to the FCRA for the greater of Ms. Davis's actual damages or statutory damages of up to $1,000 for *each occurrence*, punitive damages, reasonable attorneys' fees, and costs, per 15 U.S.C. § 1681n.

**WHEREFORE**, Ms. Davis respectfully requests this Honorable Court enter judgment against Experian for:

a.   The greater of Ms. Davis's actual damages or statutory damages of $1,000 per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.   Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3); and,

d.   Such other relief that this Court deems just and proper.

**COUNT VIII**
**NEGLIGENT VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681e(b)**
**Experian Only**
**(Pled in the Alternative to Count VII)**

247.   Ms. Davis adopts and incorporates paragraphs 1 – 209 as if fully stated herein, and pleads this count strictly in the alternative to Count VII.

248.   Experian violated **15 U.S.C. § 1681e(b)** when it failed to follow reasonable procedures to assure maximum possible accuracy of consumer reports sold regarding Ms. Davis when Experian sold consumer reports containing Tomocredit's tradeline, which reported logically-impossible information and was non-compliant with Metro 2 reporting standards. Experian was also aware that Tomocredit was disreputable for many reasons, including the fact it was advertising a credit repair service in which it would report false information to Experian for a fee.

249.   Experian owed Ms. Davis a legal duty to utilize reasonable procedures to assure the maximum possible accuracy of its consumer reports regarding Ms. Davis.

250.   Experian breached this duty when it sold consumer reports containing information false information furnished by Tomocredit.

251.   Experian thus acted negligently, and Ms. Davis is entitled to her actual damages, attorneys' fees, and costs, pursuant to 15 U.S.C. § 1681o.

**WHEREFORE**, Ms. Davis respectfully requests this Honorable Court enter judgment against Experian for:

a.    Actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681o(a)(2); and

c.     Such other relief that this Court deems just and proper.

## COUNT IX
## VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.
## Tomocredit and Community Federal

252.   Ms. Davis adopts and incorporates paragraphs 1 – 209 as if fully stated herein.

253.   Tomocredit and Community Federal violated **§ 559.72(9), Fla. Stat.**, when Tomocredit, on behalf of Community Federal: (1) attempted to collect the Account from Ms. Davis, when the balance was illegitimate and no legal right to collect the balance existed; and (2) repeatedly sent false and misleading collection communications attempting to collect the balance of a non-existent debt, (3) repeatedly initiated ACH withdrawals from Ms. Davis's Cash App account, despite nothing being owed, and Ms. Davis never consented to withdrawals, and Cash App was prohibited by NASHA regulations from making any additional ACH debits after two unsuccessful attempts.

254.   Tomocredit's intentional use of unfounded threats in connection with collection of a consumer debt, combined with unlawful electronic payment withdrawal attempts, warrant an award of punitive damages.

**WHEREFORE,** Ms. Davis respectfully requests this Honorable Court enter judgment against Tomocredit and Community Federal, jointly and severally, for:

a.     Statutory damages of **$1,000.00** pursuant to § 559.77(2), Fla. Stat.;

b.    Actual damages pursuant to § 559.77(2), Fla. Stat.;

c.    Punitive damages pursuant to § 559.77(2), Fla. Stat.;

d.    Injunctive relief preventing the Defendants from attempting to collect the alleged debt from Ms. Davis pursuant to § 559.77(2), Fla. Stat.;

e.    Reasonable costs and attorney's fees pursuant to pursuant to § 559.77(2), Fla. Stat.; and,

f.    Such other relief that this Court deems just and proper.

### COUNT X
### VIOLATIONS OF THE FCCPA, § 559.72(7), FLA. STAT.
### Tomocredit and Community Federal

255.    Ms. Davis adopts and incorporates paragraphs 1 – 209 as if fully stated herein.

256.    Tomocredit and Community Federal violated **§ 559.72(7), Fla. Stat.**, when Tomocredit, on behalf of Community Federal, engaged in conduct which could reasonably be expected to harass Ms. Davis when it attempted to collect the Account using threats of criminal action and asset seizure, as well as over 30 ACH debit attempts from her Cash App account, resulting in Ms. Davis being unable to use her account out of concern any money deposited into it would be taken by Tomocredit, on behalf of Community Federal.

257.    Tomocredit's intentional use of unfounded threats in connection with collection warrant an award of punitive damages.

**WHEREFORE,** Ms. Davis respectfully requests this Honorable Court enter judgment against Tomocredit and Community Federal, jointly and severally, for:

a.    Statutory damages of **$1,000.00** pursuant to § 559.77(2), Fla. Stat.;

b.    Actual damages pursuant to § 559.77(2), Fla. Stat.;

c.    Punitive damages pursuant to § 559.77(2), Fla. Stat.;

d.    Injunctive relief preventing the Defendants from attempting to collect the alleged debt from Ms. Davis pursuant to § 559.77(2), Fla. Stat.;

e.    Reasonable costs and attorney's fees pursuant to pursuant to § 559.77(2), Fla. Stat.; and,

f.    Such other relief that this Court deems just and proper.

## COUNT XI
## <u>VIOLATIONS OF THE FTA, § 501.616(6)(a) FLA. STAT.</u>
## <u>Tomocredit Only</u>

258.    Ms. Davis adopts and incorporates paragraphs 1 – 209 as if fully stated herein.

259.    TomoCredit made multiple "telephonic sales calls" to Ms. Davis as the term is defined by Fla. Stat. § 501.059(8)(a) which includes text messages to a consumer for the purpose of soliciting a sale of any consumer goods or services.

260.    "Consumer goods and services" are defined as "real property or tangible or intangible personal property that is normally used for personal, family,

or household purposes" and includes the credit repair services offered by TomoCredit to Ms. Davis. *See* Fla. Stat. § 501.059(1)(c).

261.    Tomocredit violated **§ 501.616(6)(a) Fla. Stat.**, when Tomocredit made myriad telephone sales calls to Ms. Davis outside the hours of 8 a.m. to 8 p.m local time to Ms. Davis.

262.    Tomocredit violated **§ 501.616(6)(b) Fla. Stat.**, when Tomocredit made myriad telephone sales calls to Ms. Davis more than three times within a 24-hour period.

263.    Tomocredit's actions were willful and intentional and warrant the award of punitive damages, especially considering the underlying service it was advertising was unlawful itself and fraudulent.

**WHEREFORE,** Ms. Davis respectfully requests this Honorable Court enter judgment against Tomocredit for:

    a.  Actual damages pursuant to § 501.625, Fla. Stat.;

    b.  Punitive damages pursuant to § 501.625 Fla. Stat.;

    c.  Injunctive relief prohibiting TomoCredit from future violations of the statute pursuant to § 501.625, Fla. Stat.;

    d.  Reasonable costs and attorney's fees pursuant to pursuant to § 501.625 Fla. Stat.; and,

    e.  Such other relief that this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Ms. Davis hereby demands a trial by jury on all issues so triable.

Respectfully submitted on March 19, 2025, by:

*/s/Thomas M. Bonan*
Thomas M. Bonan
FL Bar # 118103
SERAPH LEGAL, P. A.
2124 W Kennedy Blvd. Suite A
Tampa, FL 33606
Tel: 813-321-2347
Fax: 855-500-0705
tbonan@seraphlegal.com
Counsel for Plaintiff
